# Richmond

**RICHARD E. ROBERTSON, T/A, ETC. v. CITY OF ALEXANDRIA.**

January 19, 1970.

Record No. 7009.

Present, All the Justices.

*Armistead L. Boothe; Charles S. Perry (Boothe, Dudley, Koontz, Blankingship & Stump*, on brief), for plaintiff in error.

*Robert L. Murphy (V. Floyd Williams*, City Attorney; *Henry B. Crockett*, on brief), for defendant in error.

SNEAD, C. J., delivered the opinion of the court.

Richard E. Robertson, trading as Alexandria Drafting Company and thirty-one other plaintiffs instituted separate actions against the City of Alexandria for damages they sustained to their properties as a result of the flooding of Four Mile Run in Alexandria on August 20, 1963. It was stipulated that all the plaintiffs received damage and the cases were consolidated only for the purpose of trying the issue of the City's liability. On May 26, 1967 the jury found for the plaintiff in each of the thirty-two cases.

The City moved to set aside the verdicts contending that they were contrary to the law and the evidence, and that the court erred in failing to strike plaintiffs' evidence, in permitting the introduction of certain evidence, and in refusing certain instructions. By order entered December 26, 1967, the trial court held that "the Plaintiffs failed to prove, as a matter of law, any negligence on the part of the Defendant, City of Alexandria, which was the proximate cause of any damage sustained by Plaintiff * * *". The court set aside the jury verdicts and final judgments were entered for defendant. We granted a writ of error to the judgment in the *Robertson* case.

The question presented in this appeal is whether the evidence adduced was sufficient to sustain the jury verdict that the City of Alexandria was guilty of actionable negligence that was a proximate cause of plaintiff's damages.

The trial consumed four days. The transcript of the testimony is voluminous and numerous exhibits were introduced.

At the commencement of the trial it was stipulated as follows:

"1. Four Mile Run is a natural stream which rises in Fairfax County near the northwest corner of Arlington County line and runs ten miles in a southeasterly direction to its outlet into the Potomac River just south of the Washington National Airport. During its course it falls 400 feet to sea level. From about the point where it goes under Shirlington Road just west of Shirley Highway, and for more than 2½ miles on down to its mouth, it runs as shown on map prepared by Department of Public Works of City of Alexandria and on base map of Four Mile Run to be introduced as an exhibit by the Plaintiffs. Between Arlington and Alexandria the Run is bridged at West Glebe Road, at Mount Vernon Avenue, at U.S. Route 1, and at the George Washington Memorial Parkway. [Also referred to as Mount Vernon Memorial Highway.] West of Mount Vernon Avenue the Run winds in and out of Arlington County and Alexandria City off and on.

"2. The Four Mile Run drainage area contains 19.3 square miles of which about 3.1 square miles are in the City of Alexandria. On August 20, 1963, there existed a ponding area for Four Mile Run downstream from Mount Vernon Avenue and upstream from U.S. 1.

"3. On August 20, 1963:

"(a) The West Glebe Road Bridge had been enlarged (in 1959)

so as to increase its waterway area from approximately 290 square feet to approximately 1200 square feet.

"(b) At Mount Vernon Avenue a new bridge had been constructed (in 1958) enlarging the waterway area and from approximately 300 square feet to approximately 2400 square feet.

"(c) At U.S. Highway No. 1, Four Mile Run passed through two adjacent culverts under the Highway itself and under a part of Potomac Yards. For the upstream or westerly one-half of the width of U.S. 1, each of these adjacent culverts had a waterway area of 290 square feet, and a total waterway area together of 580 square feet. From the midline of U.S. Highway No. 1, downstream, or easterly, each culvert had a waterway area of 176.8 square feet giving the two culverts together a total waterway area of 353.6 square feet. The two original culverts had been installed by the Alexandria Washington Turnpike Company prior to 1855. They are now under the easterly one-half of U.S. Highway No. 1.

"The two original culverts were extended in an easterly direction by the Alexandria Washington Railroad in about 1855. They were identical in size with the two already existing. From 1902 to 1907 the Washington Southern Railroad constructed Potomac Yards and further extended the extensions of the two original culverts to their present total length of 480 feet easterwardly from the center line of what is now U.S. Highway No. 1. About 1943 U.S. Highway was widened and the larger culverts were built under the westerly one-half of the present U.S. Highway No. 1.

"4. The Arlandria area had also experienced floodings in August, 1942, on June 7, 1947, on May 5, 1953, on June 15, 1961, and in May of 1963."

Printed below is a rough sketch showing the course of Four Mile Run between Shirlington Road and the Potomac River.

As a result of storms depositing 6.3 inches of rainfall during the nights of August 19, and 20, 1963, the northeastern portion of Alexandria adjacent to Four Mile Run, known as Arlandria, was flooded. On August 19, between 7:03 p.m. and 8:40 p.m. three inches of rain fell and on August 20, between 7:03 p.m. and 7:35 p.m., three and two-tenths inches was deposited. The properties of Robertson and the 31 other plaintiffs were located within this area and were damaged by the high water. Franklin F. Snyder, consulting engineer and plaintiff's witness, testified that had the amount of rainfall been spread evenly over a 24-hour period there would

have been no flood. In his opinion the recurrence interval of a flood of this magnitude was between 25 and 50 years.

On January 1, 1930, the City of Alexandria annexed a considerable portion of Arlington county, extending north to Four Mile

Run, including the 3.1 square mile drainage area now in the City. Maps introduced into evidence showed that, with minor deviations, the boundary between Arlington and Alexandria followed the center line of Four Mile Run from Glebe Road to the Potomac River. No water enters the Run from drainage in Alexandria except that which naturally drains from the Run's watershed.

Following the flood of Four Mile Run in 1942, at the suggestion of Carl Budwesky, City Manager, Chester Engineers of Pittsburgh, Pennsylvania, was employed to study the flood causes. In its written report to the Alexandria City Council dated December, 1943, Chester Engineers made certain findings and recommendations. It reported, among other things, that a cause of the floods was the rapid development in the Four Mile Run basin. It pointed out that construction on land tends to increase the total runoff "because of the increase in impervious areas after removal of trees and vegetation". The report stated that "the flood tragedies will increase in geometric proportion, until ample relief measures are undertaken;

or else the adoption of alternate plan for removal of all homes and stores to higher ground and away from the hazardous Lowlands."

Chester Engineers recommended, *inter alia*, (1) that "Arlington County and Alexandria City should acquire all low lying land, by negotiation or condemnation; for the two-fold purpose of providing the required pondage and preventing of any more building developments, in those areas of flooding tendencies"; (2) that the culverts running under U.S. Highway No. 1 and the R.F.&P. Railroad tracks near the mouth of the Run be enlarged; (3) that the constricted channel of the Run between Commonwealth avenue and U.S. Highway No. 1 be enlarged, and (4) that levees or dikes be constructed around the pondage area.

In 1943, prior to the receipt of the report of Chester Engineers, the City condemned 44.88 acres of pondage land lying west of Commonwealth avenue. Later the City purchased "a little piece of land" adjoining this tract. The City caused to be filled a small portion of the pondage land for the purpose of erecting a school and a sewage pumping station.

In 1947 Arlington county and the City of Alexandria agreed orally that the County would maintain Four Mile Run between the Washington & Old Dominion Railroad tracks eastwardly to Mount Vernon avenue and the City would maintain that portion of the Run between Mount Vernon avenue and Commonwealth avenue. The agreement further provided that they would share the costs of any capital improvements equally. Substantial improvements were completed in these portions of the Run about a year prior to the August, 1963 flood. According to Philip B. Hall, Director of Public Works for the City, neither jurisdiction agreed to maintain that stretch of the Run between Commonwealth avenue and U.S. Highway No. 1 because the lands bordering that stretch were in "private ownership".

Franklin F. Snyder, who made a study of the flood, testified that it was caused by the amount of rainfall, development in the area, inadequacy of the culverts under U.S. Highway No. 1 and the railroad, and the condition of the ponding area. He stated that if the ponding area had been the same as it was in 1929 the effects of the flood would have been minimized. He calculated that the constricted channel and condition of the ponding area caused the flood to rise 3.2 feet.

Appellant contends that the evidence supports the conclusion that

a contributing cause of his damage was the negligence of the city "(1) in failing to furnish a proper outlet for the Four Mile Run storm water sewer, (2) in filling and permitting the 1930 pondage area to be filled, and (3) in failing to eliminate the constriction in the Run between Commonwealth Avenue and Highway No. 1."

It is Appellant's position that "the City, in using Four Mile Run as part of its drainage system, had exercised governmental powers by deciding to use and assuming control of the Run as part of its drainage system. All other activities connected with the use of Four Mile Run were ministerial" and "[a]11 acts or omissions by the City with respect to the use of Four Mile Run as a natural drain, carry with them the liability associated with ministerial acts * * *". In support of this position Appellant offered Instruction No. 9, which was granted without exception. It told the jury "that if they believe from the evidence that the. City together with Arlington County had assumed and exercised partial control of a portion of Four Mile Run, there was responsibility upon the City from the time it so assumed and exercised such control *in connection with that portion of Four Mile Run over which it assumed control,* and it was immaterial who may have first built or controlled the Run or the bridges or culverts lying within such portion under and through which it passed to the Potomac River." (Emphasis added.)

This instruction informed the jury that the City, on those portions of the Run over which it had assumed or exercised control, was responsible for the proper exercise of that control. The evidence shows that neither Alexandria nor Arlington had ever assumed control for maintenance or construction over the constricted area of the Run between Commonwealth avenue and the culverts under U.S. Highway No. 1. (The City admits its responsibility for the culverts under U.S. Highway No. 1, but only for ordinary maintenance such as keeping them clean. However there is no allegation that the City was negligent in this regard.) We do not agree with Appellant's argument that because Alexandria utilized this natural water course by allowing it to carry off water that would naturally find its way there and participated in some maintenance and improvements upstream it thereby assumed or exercised control for all purposes over the remaining downstream portion of the Run.

It is this absence of a demonstrated intent to assume control or an actual exercise of control over the sections of the Run complained of that distinguish the case at bar from those cited by Appellant.

Further, the evidence established that, while the City owned property along the Run from Mount Vernon avenue to Commonwealth avenue, the riparian property in the constricted section of the Run, from Commonwealth avenue to U.S. Highway No. 1, was in private ownership. To improve this portion of the channel, the City would first have had to either purchase property or a right of way along the channel or exercise its power of eminent domain and prosecute a successful condemnation proceeding. The evidence does not show whether all such improvements could have been made on the Alexandria side, but pursuant to the agreement between the City and Arlington by which the costs of capital improvements were to be borne equally some arrangement with Arlington county may have also been necessary.

The same is true for the twin culverts, the northern one of which lies in Arlington, running under the R.F.&P. Railroad property. The evidence clearly shows that removal of any one of the downstream obstructions would have had a negligible effect on the flood waters. It would have been useless to enlarge the channel between Commonwealth avenue and U.S. Highway No. 1 and not increase substantially the capacity of the culverts downstream. Thus, negotiations for or a condemnation of appropriate railroad property would have been necessary, again in conjunction with Arlington county.

As to the twin culverts, one in Arlington, and the other in Alexandria, under U.S. Highway No. 1, the evidence shows that the costs of their construction had been borne by the State and the United States Government. Although the City assumed ordinary maintenance of these culverts, an enlargement of them, as argued by the City, would have necessitated first "some sort of interjurisdictional compact with the State of Virginia, Arlington County and the United States Federal Government."

These facts distinguish this case from *City of Richmond* v. *Cheatwood*, 130 Va. 76, 107 S.E. 830 (1921), holding the City liable for negligence, cited by Appellant as a case "whose facts are unusually similar" to those of the case at bar. In *Cheatwood*, as in the instant case, arches over a stream, that were initially adequate, became inadequate after development of surrounding property. But in that case the arches were constructed by the City under City streets and were fully under City control.

Instruction No. 1, which was given without objection and became the law of the case, instructed the jury that:

"The Court instructs the jury that under the law of Virginia, the City of Alexandria has power to provide for the adequate drainage of any and all areas in the City, and to effectuate such power, the City may install and maintain drainage systems and acquire by gift, purchase, lease, condemnation, or otherwise, lands, buildings, structures, or any interest therein, and may appropriate money therefor.

"The Court further instructs the jury that the City is vested with the power of eminent domain to the extent necessary to effect such acquisitions, and is empowered to institute legal proceedings to enable it to widen or clear obstructions from a sewer or drainage system even on private property.

"*The Court further instructs the jury that the failure of the City to exercise such power is not in and of itself negligence.*" (Italics supplied.)

The wisdom of eliminating the downstream obstructions, as far as reducing the extent of flooding is concerned, was clearly demonstrated by the evidence. However, it is equally as clear that this was not the only consideration; much more than a unilateral decision by the City of Alexandria to increase the Run's outlet capacity was necessary before any such project could actually be undertaken.

Instruction No. 1 told the jury that the failure of the City to exercise the power to provide adequate drainage, to acquire lands, buildings, etc. by purchase, condemnation or otherwise, was not in and of itself negligence. In light of this instruction, we hold that the evidence adduced is not sufficient, as a matter of law, to show actionable negligence on the part of the City for not furnishing a proper outlet for Four Mile Run.

Appellant also contends that the City was negligent "in filling and permitting the 1930 pondage area to be filled". Expert testimony showed that in computing the filling that took place from 1930 to 1963 an area bounded by Mount Vernon avenue and the high water mark of the 1963 flood was used. However there was no evidence showing that this flood area and the "1930 pondage area" were the same. The report of Chester Engineers, completed in 1943, recognized that in 1930 substantial pondage was available, primarily in an area of about 78 acres known as Four Mile Run Bay (a part of which was in Arlington county), and recommended re-obtaining all low-lying land including the Bay. As argued by the City "no one at any time had ever even suggested that the perimeter

of the land mass chosen by Appellants' expert for computation of fill * * * was in any way ever intended to be reserved as a natural storage basin for surface and flood waters". It cannot be maintained that the City was on notice, by virtue of a report rendered in 1943, that flooding would result from filling anywhere in an area selected in 1963 unless the two areas were shown to be substantially the same. The evidence failed to show the relationship between the 1930 pondage area recommended by Chester Engineers and the area from which the fill was computed.

The record shows that because of fill in the area bounded by the August, 1963 flood's high water mark there has been a 46.5% decrease in pondage volume since 1930. The Appellant's expert testified that as a result of this diminution the flood level on August 20, 1963 was about three feet higher than it would have been absent any filling. This increase in flood level was said to be equivalent to 730 acre-feet.[1] Of this, 441 acre-feet were attributable to fill within Alexandria itself. However, there was no evidence that showed the effect of this 441 acre-feet on the flood level, that is, the effect of that portion of fill within the City of Alexandria.

Appellant established that the City caused some fill to be deposited in the Four Mile Run Bay area west of Commonwealth avenue for the construction of a school and a sewer pumping station. In addition, the City conveyed a small strip of land to the Arlington Development Company to provide access from U.S. Highway No. 1 to a garbage dump operated by the company. An undetermined amount of fill was deposited during the operation of this dump. Appellant's expert also testified that some portion of the fill in the flood area was the result of alluvial accretion from 1930 to 1963. While the evidence showed these three primary sources of fill, there was never established any causal link between that part of the fill for which the City was responsible and the height or extent of the flooding and Appellant's resulting damage.

Instruction E, which was not excepted to and became the law of the case, instructed the jury that it "cannot find the verdict in favor of the plaintiffs unless it has been demonstrated by the preponderance of the evidence that all or a definite part of the damages complained of was caused by some act or omission of the City * * *." In the absence of a showing of a causal relationship between that part of the fill attributable to acts or omissions of the City and the

---

[1] One acre-foot is the amount of water necessary to cover one acre one foot deep.

damage sustained by Appellant we must conclude that the Appellant has failed under Instruction E to demonstrate the City's responsibility for all or a definite part of his damage.

We hold that the trial court was correct in finding that the evidence was insufficient, as a matter of law, to establish actionable negligence on the part of the City, which was a proximate cause of Appellant's damage, and in setting aside the verdict of the jury.

The judgment appealed from is

*Affirmed.*